[Cite as *In re N.W.*, 2022-Ohio-4346.]

COURT OF APPEALS
LICKING COUNTY, OHIO
FIFTH APPELLATE DISTRICT


IN RE: N.W.

JUDGES:
Hon. Earle E. Wise, Jr., P.J.
Hon. William B. Hoffman, J.
Hon. Patricia A. Delaney, J.

Case No. 2022 CA 00035


O P I N I O N



CHARACTER OF PROCEEDINGS: Appeal from the Licking County Court of Common Pleas, Juvenile Division, Case No. F2018-0449


JUDGMENT: Affirmed

DATE OF JUDGMENT ENTRY: December 5, 2022


APPEARANCES:

For Appellee

JENNY WELLS
Licking County Prosecutor

J. BRANDON PIGG
Assistant Prosecuting Attorney
65 E. Main Street – 3rd Floor
Newark, Ohio 43055

Guardian ad Litem

CEDRIC COLLINS
P.O. Box 564
Pickerington, Ohio 43147

For Appellant

CAROLYNN E. FITTRO
1335 Dublin Road – Suite #115F
Columbus, Ohio 43215

For Mother

MATTHEW DAWSON
35 S. Park Pl. – Suite #150
Newark, Ohio 43055

*Hoffman, J.*

**{¶1}** Appellant P.R. ("Father") appeals the April 26, 2022 Opinion/Judgment Entry entered by the Licking County Court of Common Pleas, Juvenile Division, which terminated his parental rights with respect to his minor child ("the Child") and granted permanent custody of the Child to appellee Licking County Job and Family Services ("LCJFS").

STATEMENT OF THE FACTS AND CASE

**{¶2}** Father and R.W. ("Mother") are the biological parents of the Child. Parents have never been married.

**{¶3}** On July 9, 2018, LCJFS filed a complaint, alleging the Child was dependent. The complaint asserted the Child, who was 4 years old, was found in a stranger's home, after exiting her own home. The Child had been seen wandering alone down the road. Mother contacted the police approximately 45 minutes after the Child had been discovered in the stranger's home. When LCJFS workers entered Mother's residence, they discovered there were no beds for the Child and her sibling (collectively, "the Children"), and the Children were sleeping on coats placed on the floor. In addition, LCJFS workers found little to no food in the residence. Until recently, the family had been residing at a hotel for several months. The Children were dirty and had lice, and were behind on their vaccinations. LCJFS workers observed bruises on the Children's buttocks, lower backs, and legs. Mother is unemployed and relies upon her boyfriend, Daniel Fosnaugh, for support. Fosnaugh has a history of domestic violence and alcohol abuse, and was on probation in Licking County. Mother and Fosnaugh both tested positive for THC. In addition, the complaint noted Father resides in Indiana, and had had no contact with the Child since infancy.

**{¶4}** The trial court issued an ex-parte emergency order of removal of the Child and her sibling on July 9, 2018.[1] The trial court conducted a shelter care hearing on July 30, 2018, and placed the Child in the emergency shelter care of LCJFS. The trial court appointed Attorney Yousef Faroniya as Guardian ad Litem ("GAL") for the Child.[2]

**{¶5}** Following an adjudicatory hearing on October 9, 2018, the trial court found the Child to be dependent and immediately proceeded to disposition. The trial court ordered the Child remain in the temporary custody of LCJFS. The trial court specifically found LCJFS had made reasonable efforts to prevent the removal of the Child from the home. October 11, 2018 Magistrate's Decision at 2. The trial court conducted review hearings on December 28, 2018, June 27, 2019, December 27, 2019, June 26, 2020, December 23, 2020, and June 23, 2021, and maintained the status quo each time. The trial court made reasonable efforts findings at each hearing.

**{¶6}** Mother filed a motion to modify disposition on March 21, 2019, seeking termination of temporary custody and the return of the Child to her full legal custody. On June 11, 2019, LCJFS requested a six-month extension of temporary custody in order for an Interstate Compact on the Placement of Children ("ICPC") assessment of Father to be completed in Indiana. The trial court granted LCJFS's request for a six-month extension via Judgment Entry filed July 31, 2019.

**{¶7}** LCJFS filed a motion for permanent custody on November 6, 2019. Therein, LCJFS informed the trial court Father was not approved for ICPC due to his criminal history, Father's girlfriend's substantial history with Indiana child protective services, and the fact Father and his girlfriend were in debt and unable to financially meet

---

[1] The Child's sibling is the subject of another case.
[2] Cedric Collins was appointed GAL on July 24, 2019, after the unexpected death of Yousef Faroniya.

their own needs.  The hearing on LCJFS's motion was continued a number of times due to the ongoing COVID-19 pandemic.  Father filed a motion for custody on May 11, 2020.  Mother filed a motion to return legal custody on July 15, 2020.  Father filed a motion to modify disposition, requesting legal custody of the Child, on March 8, 2021.

**{¶8}** The magistrate conducted a hearing on the motions on March 4, 2021, and May 11, 24, and 28, 2021.  The following evidence with respect to Father only was presented at the hearing.

**{¶9}** Allison Keeley, the ongoing caseworker originally assigned to the family, testified Father was living, and continued to live, in Muncie, Indiana, throughout the pendency of the matter.  LCJFS requested an ICPC, which denied placement of the Child with Father.  Father was doing well and LCJFS considered transitioning the Child for placement with Father.  However, LCJFS decided not to move forward after the ICPC was denied.

**{¶10}** Shaina Williams with Close to Home Supervised Visitation Center testified she supervised visits between Father and the Child.  Father's visits generally went well.  However, during visits on December 5, 2020, and January 30, 2021, the Child had outbursts which required calls to the foster mother to pick up the Child and resulted in the visits ending early.  During the January 30, 2021 visit, the Child became violent and hit Father, his girlfriend, and Williams.  Williams explained the Child would "blow up" whenever she was told, "No," or did not get what she wanted. Transcript of Hearing, Vol. I at 120.  Williams observed between 18 and 20 visits between Father and the Child and all, but the two reported visits, went well.  On cross-examination, Williams stated Father

never had to be redirected for inappropriate behavior and he did not trigger the Child's outbursts.

{¶11} Cindy White, the Child's foster mother, testified the Child came to her on December 2, 2020. That evening, when White told the Child it was time for bed, the Child threw "a huge tantrum." *Id.* at 174. White described the severity of the Child's tantrums when the Child initially came into her home. The Child was physically and verbally violent both in the foster home and at school. On her first day of school, the Child was "out of control" – throwing chairs and other items and engaging in self-harm.

{¶12} On the Child's second evening with White, the Child became angry, ranting, running around, breaking things, and throwing things. White called her boss, explaining, "I have been a foster mom for 12 years. I've been around kids a lot of the time, but I've never dealt with the anger issue as this child had." *Id.* at 178. White's boss suggested she talk to the Child. White asked the Child if she would like to speak to "Stephanie." At the name "Stephanie," the Child threw herself onto the floor and began weeping. The Child eventually crawled into White's lap, hugging White, and crying into the phone, "Why did – why did you make me leave? Why – why couldn't I stay with you?" *Id.* at 179. White realized the Child thought it was her first foster mother, who was also named "Stephanie."

{¶13} White stated the Child was "always very anxious" before visits with Father. *Id.* at 184. Following the visits, "it's like a roller coaster. She struggles with her feelings and she doesn't know how to put anything into words; so she kind of lashes out." *Id.* The Child refers to Father as "Patrick." White described picking up the Child early from a visit with Father. As White put the Child into her vehicle, the Child threw the car seat at her and started screaming and yelling. The Child then jumped out of the car and ran around

the street.  Once back in White's vehicle, the Child was crying and screaming, and throwing things.

{¶14} White explained the Child is behind developmentally.  The Child cannot spell her own name and does not recognize numbers.  The Child did not know her own age when she came into White's care.  On cross-examination, White indicated the Child still had outbursts, but was doing "much better."  *Id.* at 192.  White maintains a consistent routine for the Child.  White constantly prepares the Child for what will occur next.  White has learned de-escalation techniques for handling the Child's outbursts.

{¶15} Juanita Oiler, a clinical therapist with the Village Network Treatment House of Care, testified she conducted an evaluation of the Child.  Oiler diagnosed the Child with post-traumatic stress syndrome disorder, receptive expressive communication disorder, partial fetal alcohol syndrome, and a developmental disability.  Oiler explained because of the trauma she has experienced, the Child "reacts in ways that are different than you would expect necessarily.  So she is – tends to be hyperaroused, she tends to be hypersensitive to stimulus, she has cognitive issues, she has communication issues, she has relational disorders, and all of those things because of the trauma she has experienced throughout her life."  Tr. Vol. II at 303.  Oiler continued, "She has difficulty expressing herself in ways that are understandable and expected.  So she – she does become over-reactive when she expresses herself.  She does have some difficulty processing sometimes, and with the fetal alcohol – the partial fetal alcohol syndrome we find it's not affecting her growth physically, but it does affect her development and her emotional – her intellectual development."  *Id.* at 303-304.  Although the Child is 6 ½ years old, she functions at about a 2 ½ year old level.  The Child's IQ is in the low 70s.

{¶16} With regard to treatment, the Child also works with a behavior management specialist every week. The Child sees a psychiatrist at Children's Hospital. The Child is in specialized educational placement in school. Oiler stated the Village Network provides ongoing training and education to the Child's foster parents. Oiler noted, dealing with the Child would be different from what one would expect in a conventional parent/child relationship: "It does require a lot of special training. It does require a lot of special interventions. It does require a lot of support, and it does require a great deal of patience, as well as the willingness to adapt and modify and try new things." *Id.* at 310.

{¶17} On cross-examination, Oiler stated the Child is starting to self-regulate quicker and has become less reactive. Oiler credits the Child's foster parents with her progress as they are very cognizant of her needs and have provided the Child with assistance. Oiler indicated the Child needs a schedule of regularly planned daily activity. Transitions are difficult for the Child.

{¶18} Kelsey Weisenstein, an ongoing social worker with LCJFS, was assigned to the family in December, 2019. Weisenstein stated she reviewed the results of the ICPC and explained the reasons for the denial were Father's lack of a support system, a negative $750/month income, prison time for a 2000 child molestation conviction, and his live-in girlfriend had substantiated children's services involvement. Weisenstein detailed the Child's foster placement. On cross-examination, Weisenstein explained, she did not add case plan services for Father after the ICPC was denied because once the ICPC was denied, the Child could not be placed with Father. Weisenstein added, although Father's financial situation had improved, other factors resulting in the denial of the ICPC could

not be changed. Weisenstein agreed Father provided support for the Child and showed a level of dedication to the Child.

**{¶19}** Palma Ashcraft, an ongoing social worker with LCJFS, was assigned to the family on January 22, 2021. On cross-examination, Ashcraft agreed the Child enjoyed her visits with Father. Ashcraft acknowledged Father's financial situation had improved since the ICPC and Father had shown a level of dedication to the Child.

**{¶20}** Cedric Collins, the court-appointed GAL, testified he was assigned to the Child after the original GAL passed away unexpectedly. Collins contacted the foster family and LCJFS. He met with the Child and visited Father's home. Collins questioned whether Father was really able to comprehend and address the concerns and special needs of the Child. While Father is aware the Child has special needs, Collins had not seen any evidence Father had educated himself on how to best advocate and work with the Child. Collins opined it was in the best interest of the Child to grant permanent custody to LCJFS.

**{¶21}** Via Decision of Magistrate filed June 16, 2021, the magistrate denied Father's motion for custody and LCJFS's motion for permanent custody. The magistrate found Father has consistently shown a dedication to the Child and Father's financial situation had substantially changed "in a positive direction." Decision of Magistrate at 4, unpaginated. In addition, the magistrate added the issues raised in the ICPC investigation were old and an updated ICPC "would be beneficial." *Id.* The magistrate noted placement with Father "could be considered in the future." *Id.*

**{¶22}** LCJFS filed timely objections to the magistrate's decision. Via Judgment Entry filed July 6, 2021, the trial court returned the matter to the magistrate for clarification

as to the disposition.  The magistrate issued a subsequent decision on August 10, 2021, again denying all parties' motions.  LCJFS filed timely objections on August 11, 2021.

**{¶23}** Via Opinion/Judgment Entry filed April 26, 2022, the trial court granted, in part, LCJFS's objections to the magistrate's decision, terminated Father and Mother's parental rights, and granted permanent custody of the Child to LCJFS.  The trial court found LCJFS failed to make reasonable efforts to reunify Father and the Child pursuant to R.C. 2151.414(B)(1)(a) and R.C. 2151.414(E)(1), but found granting permanent custody of the Child to LCJFS was proper as such was in the Child's best interest and the Child had been in the temporary custody of LCJFS for twelve or more of a consecutive twenty-two month period.

**{¶24}** It is from this judgment entry Father appeals, raising the following assignments of error:

I. THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN FINDING BY CLEAR AND CONVINCING EVIDENCE THAT IT WOULD BE IN THE BEST INTERESTS OF [THE CHILD] TO PERMANENTLY TERMINATE THE PARENTAL RIGHTS OF HER PARENTS AND PLACE HER IN THE PERMANENT CUSTODY OF LICKING COUNTY JOB AND FAMILY SERVICES, CHILDREN SERVICES DEPARTMENT.

II. THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT FOUND BY CLEAR AND CONVINCING EVIDENCE [THE CHILD] COULD NOT BE PLACED WITH HER FATHER WITHIN A

REASONABLE TIME OR SHOULD NOT BE PLACED WITH HER FATHER.

III. THE TRIAL CURT ERRED AND ABUSED ITS DISCRETION WHEN IT FOUND BY CLEAR AND CONVINCING EVIDENCE THAT LICKING COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES DID NOT MAKE REASONABLE EFFORTS TO REUNIFY THE MINOR CHILD WITH FATHER, BUT STILL GRANTED THE MOTION FOR PERMANENT CUSTODY OF THE CHILD TO THE AGENCY.

**{¶25}** This case came to us on the expedited calendar and shall be considered in compliance with App. R. 11.2(C).

I, II

**{¶26}** In his first assignment of error, Father contends the trial court erred and abused its discretion in finding the best interest of the Child would be served by terminating Father's parental rights and granting permanent custody of the Child to LCJFS. In his second assignment of error, Father asserts the trial court erred and abused its discretion in finding the Child could not be placed with Father within a reasonable time or should not be placed with Father.

**{¶27}** Initially, Father argues the trial court erred in conducting the hearing on LCJFS's motion for permanent custody beyond the statutory 120 day time period set forth in R.C. 2151.414(A)(2).

**{¶28}** R.C. 2151.414(A)(2) provides, in part:

The court shall hold the hearing scheduled pursuant to division (A)(1) of this section not later than one hundred twenty days after the agency files the motion for permanent custody, except that, for good cause shown, the court may continue the hearing for a reasonable period of time beyond the one-hundred-twenty-day deadline. The court shall issue an order that grants, denies, or otherwise disposes of the motion for permanent custody, and journalize the order, not later than two hundred days after the agency files the motion.

R.C. 2151.414(A)(2).

{¶29} Despite the time limitation, however, R.C. 2151.414(A)(2) also expressly states "[t]he failure of the court to comply with the time periods set forth in division (A)(2) of this section does not affect the authority of the court to issue any order under this chapter and does not provide any basis for attacking the jurisdiction of the court or the validity of any order of the court."  R.C. 2151.414(A)(2).

{¶30}  In *In re M.W.*, 8th Dist. Cuyahoga Nos. 98214 and 98215, 2012-Ohio-5075, the Eighth District Court of Appeal explained, "Because of this expressive language, this court has determined that the time limitation language in R.C. 2151.414(A)(2) is 'directory' rather than mandatory — the language exists 'for the assurance of the prompt resolution of child custody matters,' rather than as a jurisdictional perquisite." *Id.* at ¶ 21.  Further, "[b]ecause the time provisions of R.C. 2151.414(A)(2) are directory and not mandatory, the Ohio Supreme Court has held that a litigant must seek a writ of procedendo against the juvenile court if it does not comply with these time limits." *In re K.H.*, 5th Dist. Licking

No. 13-CA-100, 2014-Ohio-1594, ¶ 14, citing *In re Davis*, 84 Ohio St.3d 520, 523-524, 1999-Ohio-0419. If a party does not seek such a writ, he is stopped from arguing on appeal that delay by the juvenile court violated his due process rights. *In re Davis*, supra at 524.

**{¶31}** Father did not file a writ of procedendo against the trial court. Accordingly, we find Father's due process rights were not violated.

**{¶32}** We now turn to Father's arguments relative to the trial court's finding it was in the Child's best interest to grant permanent custody to LCJFS and finding the Child could not be placed with Father within a reasonable time or should not be placed with Father.

**{¶33}** As an appellate court, we neither weigh the evidence nor judge the credibility of the witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base its judgment. *Cross Truck v. Jeffries* (Feb. 10, 1982), Stark App. No. CA5758. Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr.* (1978), 54 Ohio St.2d 279, 376 N.E.2d 578.

**{¶34}** R.C. 2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates the trial court schedule a hearing and provide notice upon the filing of a motion for permanent custody of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in long term foster care.

**{¶35}** Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply: (a) the child is not abandoned or orphaned, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or (d) the child has been in the temporary custody of one or more public children services agencies or private child placement agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.

**{¶36}** Therefore, R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, the trial court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.

**{¶37}** Although Father assigns as error the trial court's finding the Child could not be placed with Father within a reasonable time or should not be placed with Father, within the argument portion of his Brief, Father acknowledges the trial court found "the Agency failed to prove by clear and convincing evidence that Ohio Revised Code 2151.414(E) existed as to Father."[3]  Brief of Appellant at 6.  In its April 26, 2022 Opinion/Judgment

---

[3] R.C. 2151.414(E) provides: "In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court

Entry, the trial court found, "the Magistrate did not err in concluding that clear and convincing evidence did not demonstrate, based upon R.C. 2151.414(B)(1)(a) and R.C. 2151.414(E)(1), that [the Child] cannot placed or should not be placed with [Father] because the Agency failed to make reasonable and diligent efforts towards reunification." *Id.* at 12.

---

shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. * * *.
(2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent * * *;
(3) The parent committed any abuse as described in section 2151.031 of the Revised Code against the child * * *;
(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, * * *;
(5) The parent is incarcerated for an offense committed against the child or a sibling of the child;
(6) The parent has been convicted of or pleaded guilty to an offense under division (A) or (C) of section 2919.22 * * *.
(7) The parent has been convicted of or pleaded guilty to one of the following:
(a) An offense under section 2903.01, 2903.02, or 2903.03 of the Revised Code * * *;
(b) An offense under section 2903.11, 2903.12, or 2903.13 of the Revised Code * * *;
(c) An offense under division (B)(2) of section 2919.22 of the Revised Code * * *;
(d) An offense under section 2907.02, 2907.03, 2907.04, 2907.05, or 2907.06 of the Revised Code * * *;
(e) An offense under section 2905.32, 2907.21, or 2907.22 of the Revised Code * * *;
(f) A conspiracy or attempt to commit, or complicity in committing, an offense described in division (E)(7)(a), (d), or (e) of this section.
(8) The parent has repeatedly withheld medical treatment or food from the child * * *.
(9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment * * *.
(10) The parent has abandoned the child.
(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child * * *.
(12) The parent is incarcerated at the time of the filing of the motion for permanent custody or the dispositional hearing * * *.
(13) The parent is repeatedly incarcerated, and the repeated incarceration prevents the parent from providing care for the child.
(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.
(15) The parent has committed abuse * * *.
(16) Any other factor the court considers relevant.

{¶38} The trial court did, however, find, pursuant to R.C. 2151.414(B)(1)(d), the Child had been in the temporary custody of LCJFS for a period of time in excess of twelve of the prior twenty-two consecutive months. *Id.* at 12-13. The 12 of 22 finding alone, in conjunction with a best interest finding, is sufficient to support the grant of permanent custody. *In re Calhoun,* 5th Dist. No. 2008CA00118, 2008-Ohio-5458, ¶ 45.

{¶39} The trial court also found a grant of permanent custody was in the Child's best interest.

{¶40} R.C. 2151.414(D) sets forth the factors to be considered in making a best interest determination and provides:

> (D)(1) In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of section 2151.415 of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services

agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

**{¶41}** Upon review, we find the trial court's decision finding permanent custody was in the best interests of the Child was supported by relevant, competent and credible evidence. The evidence at the hearing established the Child had a relationship with Father, but such was limited to contact at scheduled visitation. The Child had significant special needs and behaviors, and, as a result, was physically and verbally violent. The Child required intensive services and resources. In a December 22, 2021 Semi-Annual Review Report, the GAL noted Father lacked the understanding and meaning to parent the Child and meet the Child's needs. At the hearing, the GAL questioned whether Father was really able to comprehend and address the concerns and special needs of the Child. The GAL added, while Father was aware the Child has special needs, the GAL had not

seen any evidence Father had educated himself on how to best advocate and work with the Child. The GAL opined it was in the best interest of the Child to grant permanent custody to LCJFS. Although the Child's was 6 ½ years old at the time of the hearing, she functioned on a 2 ½ year old level.

{¶42} In its April 26, 2022 Opinion/Judgment Entry, the trial court considered each of the factors set forth in R.C. 2151.414(D)(1). The trial court found the Child had a relationship with Father, but the relationship was limited to the contact at their visits. The trial court indicated the Child had significant special needs and behaviors, which required extensive and intensive services and resources. The Child needed constant supervision, consistency in schedule and routine, and on-going therapy. The trial court determined Father, due to his limited relationship with the Child, was unable to meet the Child's special needs. The trial court noted the Child was unable to express her wishes. The trial court found the Child had been in the temporary custody of LCJFS for 12 or more months of a consecutive 22-month period, adding the Child needed stability. The trial court added the Child's need for a legally secure permanent placement was immense given her special needs. In addition, the trial court stated the GAL had conducted an investigation and found granting permanent custody was in the Child's best interest.

{¶43} Based upon the foregoing, we find Father's first and second assignment of error to be without merit, and overrule the same.

III

{¶44} In his final assignment of error, Father submits the trial court erred and abused its discretion in finding LCJFS made reasonable efforts to reunify him with the Child when LCJFS failed to request an additional ICPC. Based upon the arguments

asserted within this assignment of error, this Court interprets Father's position to be the trial court erred and abused its discretion in granting permanent custody of the Child to LCJFS after finding LCJFS failed to make reasonable efforts to reunify him with the Child.

**{¶45}** A trial court is not obligated by R.C. § 2151.419 to make a determination an agency used reasonable efforts to reunify the family at the time of the permanent custody hearing unless the agency has not established reasonable efforts have been made prior to that hearing. *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 21; see also, R.C. § 2151.419. A trial court is only obligated to make a determination an agency has made reasonable efforts to reunify the family at "adjudicatory, emergency, detention, and temporary-disposition hearings, and dispositional hearings for abused, neglected, or dependent children, all of which occur prior to a decision transferring permanent custody to the state." *In re C.F.*, supra at ¶ 41; *In the Matter of L.J.*, 5th Dist. Licking No. 2019 CA 0079, 2019-Ohio-5231, ¶44.

**{¶46}** In this case, the trial court made the requisite determination LCJFS made reasonable efforts at each of the following hearings: the July 10, 2018 temporary orders hearing, the October 9, 2018 adjudicatory/dispositional hearing, and the December 28, 2018, June 27, 2019, December 27, 2019, June 26, 2020, December 23, 2020, and June 23, 2021 review hearings.  The trial court was not required to make such finding at the permanent custody hearing.

**{¶47}**  Accordingly, Father's third assignment of error is overruled.

**{¶48}**  The judgment of the Licking County Court of Common Pleas, Juvenile Division, is affirmed.


By: Hoffman, J.

Wise, Earle, P.J.  and

Delaney, J. concur


_____

HON. WILLIAM B. HOFFMAN


_____

HON. EARLE E. WISE, JR.


_____

HON. PATRICIA A. DELANEY